511 A.2d 887

Selim A. Elias, M.D., Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Polk Center, Respondent.

Argued March 11, 1986, before Judges MacPhail, Doyle and Barry, sitting as a panel of three.

*Barbara L. Smith, Mahany, Roeder & Smith,* for petitioner.

*James S. Marshall,* Assistant Counsel, for respondent.

OPINION BY JUDGE DOYLE, June 17, 1986:

This is an appeal by the estate of Selim Elias, M.D., from a determination of the State Civil Service Commission (Commission) denying Dr. Elias an award of backpay for anticipated overtime and approving the action of the Department of Public Welfare (Appointing Authority) in offsetting from Dr. Elias' backpay the sum of $11,645.34 which sum Dr. Elias had earned from other employment during the period of his removal from public service. The estate also seeks interest for the period from the doctor's removal until the date of payment of the award. This case has had a tortuous procedural history but a basic understanding of the prior proceedings is necessary.

The Appointing Authority removed Dr. Elias from his position as a Physician II at Polk Center on October 3, 1978. Dr. Elias appealed this action to the Commission which sustained the appeal, reinstated Dr. Elias as of October 23, 1979, but declined to award backpay. Dr. Elias then filed a motion for reconsideration before the Commission requesting an award of backpay. The Commission denied the request and appeal to this Court followed. In *Elias v. Department of Public Welfare, Polk Center*, 57 Pa. Commonwealth Ct. 503, 426 A.2d 762 (1981) (Elias I), we remanded the matter to the Commission for specific findings of fact on the denial of backpay. Upon remand the Commission issued a supplemental adjudication and order again denying backpay. Dr. Elias again appealed to this Court which in *Elias v. Department of Public Welfare, Polk Center*, 70 Pa. Commonwealth Ct. 255, 452 A.2d 1127 (1982) (Elias II), reversed the Commission's order and awarded backpay "for the period of [Dr. Elias'] improper dismissal from employment commencing October 23, 1978, less appropriate deductions."[1] The Court thus remanded

---

[1] Our Court Order contained an error in the date of the improper removal. The removal date was October 3, 1978, not October 23, 1978. This fact is not in dispute.

the matter to the Commission again for a computation of the backpay. The Commission then, *without conducting additional hearings or making additional findings,* issued an order directing the Appointing Authority to pay Dr. Elias "any loss of wages or emoluments suffered during the period of October 3, 1978 to the date of his reinstatement, *less any wages earned or benefits received under the Public Laws of Pennsylvania* as established by a sworn statement to be submitted by [Dr. Elias.]" The Commission's power to enter this order emanates from Section 951(a) of the Civil Service Act (Act),[2] 71 P.S. §741.951(a).

At some point prior to January 21, 1983 Dr. Elias died. But on that date his wife and personal representative filed an affidavit claiming that under the Commission's order the estate was entitled to $48,534.40. The Appointing Authority maintains that it is liable to the estate for only $28,235.56. In April of 1983 the estate filed a petition with the Commission seeking enforcement of its order. In May of 1983 the Appointing Authority responded to the petition setting forth its position that it had complied with the order. The Commission approved the figure arrived at by the Appointing Authority and this appeal followed.

In order to understand the dispute in the amount owed it is necessary to examine the Commission's order as well as the breakdown of figures which the estate claims should be used and the breakdown actually employed by the Appointing Authority. Under the estate's

---

[2] Act of August 5, 1941, P.L. 752, *as amended.* Section 951(a), which was added by Section 27 of the Act of August 27, 1963, P.L. 1257, reads in pertinent part:

If [a] final decision [by the Commission] is in favor of the employe, the appointing authority shall reinstate him with the payment of so much of the salary or wages lost by him as the Commission may in its discretion order.

theory Dr. Elias is entitled to $48,534.40 based upon the following calculations. From January 1, 1978 until the date of his removal on October 3, 1978, a period of 276 days, Dr. Elias actually earned $36,087.21; this figure includes overtime. The estate therefore divided the $36,087.21 by 276 and arrived at per diem earnings of $130.75. The doctor remained removed for 385 days and hence the $130.75 figure was multiplied by 385 for a total of $50,338.75. As of July 1, 1979, Dr. Elias, had he been employed, would have received a raise of $5.30 per day. This raise would have applied to the 119 days he remained removed in 1979. Thus, the estate multiplied $5.30 times 119 days and arrived at a figure of $604.20 which it added to the $50,338.75 for a total of $50,942.95. The estate then considered $11,645.34 which Dr. Elias earned through "alternate employment." It offset this amount by a loss of $9,236.79 which the doctor sustained when he had to close his private practice, allegedly because of his unwarranted dismissal, and arrived at a figure of $2,408.55 which it then deducted from the $50,942.95 for a final total of $48,534.40 to which it now claims entitlement. The estate's computation is summarized as follows:

**Income based on 1978 Wages**
($130.75/day x 385 days)     $50,338.75
**July 1, 1979 raise**
($5.30/day x 119 days)       $    604.20

**Income the doctor should have earned—**
October 3, 1978 to October 23, 1979     $50,942.95
**Income earned through**
alternate employment         $11,645.34
**Loss incurred through**
loss of private practice     (9,236.79)

Income actually earned—

| | |
|---|---|
| October 3, 1978 to October 23, 1979 | $ 2,408.55 |
| Back pay less appropriate deductions | $48,534.40 |

(Affidavit of the estate dated January 21, 1983).

The Appointing Authority, in its computations, however, used much different figures. It began by awarding the doctor his salary of $37,098.30.[3] This figure does *not* include overtime. It then added $2,297.70 as the annual leave payout for the period of the removal, $207.40 of annual leave adjustment, and $277.50 of personal leave, for a total of $39,880.90. Next, the Appointing Authority deducted the entire $11,645.34 of income earned by the doctor in his alternate employment (without allowing for losses incurred in his private practice) and, accordingly, arrived at a final figure of $28,235.56. The summary of these calculations is as follows:

| | |
|---|---|
| Salary | $37,098.30 |
| Plus: | |
| Annual Leave Payout for period of 10/3/78 to 10/23/79 | $ 2,297.70 |
| Annual Leave Adjustment | $ 207.40 |
| Personal Leave | $ 277.50 |
| Total | $39,880.90 |
| Less: | |
| Income Earned during period of 10/3/78 to 10/23/79 | $11,645.34 |
| Amount owed to Dr. Elias | $28,235.56 |

(Counsel for Appointing Authority's letter to the Commission dated May 9, 1983).

---

[3] The letter from counsel for the Appointing Authority to the Commission explaining the computations employed by the Appointing Authority does not specifically state whether the $37,098-.30 is the doctor's annual salary (*i.e.*, for 365 days) or the total salary for the period of his removal (*i.e.*, 385 days). Based upon the break-

When the estate appealed the Appointing Authority's determination, the Commission embraced it as correct, rejected the estate's computation, and in its letter advice to the estate in the answer to the petition for enforcement specifically stated that because overtime pay is speculative only it can not properly be awarded as part of backpay. The Commission also wrote:

> As for any losses incurred through the loss of [the doctor's] private practice, the Commission specifically declines to include such amounts as part of the total computation. It is our opinion, and you [i.e., the estate] are hereby advised, that the amount of wages due under the Commission's Order is limited to the official salary and normal emoluments applicable during the period in question.

Thus, the dispute centers principally upon whether anticipated overtime is properly included within the Commission's and this Court's orders pertaining to backpay and whether the monies earned from alternate employment are properly offset, in whole or in part, from the doctor's salary.

Considering first the question of overtime, we are of the view that the Commission was in error in declaring that as a matter of law anticipated overtime wages are too speculative to permit recovery. By analogy to contract actions, the law provides that damages must be proved with *reasonable* certainty, *Wilcox v. Regester,* 417 Pa. 475, 207 A.2d 817 (1965), and where there is a basis in the evidence from which a reasonable computation of damages may be arrived at, an award of damages may be based on this evidence even though there may be *some* uncertainty as to the amount of the damages. *Solar Electric Corp. v. Exterminator Corp. of America,*

down of figures in this letter (as reflected in the chart reproduced on page 223 of this opinion) we assume that this figure is for the entire period of removal.

384 Pa. 233, 120 A.2d 533 (1956). Succinctly put, the law in allowing damages for breach of contract requires only reasonable certainty, as distinguished from absolute certainty on the one hand and mere conjecture on the other hand. *Rothrauff v. Sinking Spring Water Co.,* 339 Pa. 129, 14 A.2d 87 (1940). The Appointing Authority cites *Pennsylvania Board of Probation and Parole v. Baker,* 82 Pa. Commonwealth Ct. 86, 474 A.2d 415 (1984) wherein we held that the Commission's power to make an appropriate order under Section 951(b) of the Act,[4] 71 P.S. §741.951(b), is restricted to assuring that the employee receives the rights accorded to him by the statute. Taking the position that an employee has no statutory right to work overtime, the Appointing Authority thus argues by analogy to *Baker* that an award of backpay including anticipated overtime is not authorized under Section 951(a). We cannot agree. While we acknowledge that one does not have the right to work overtime at any given point in time at his own choosing, each employee does have the right *to be considered for overtime employment* in his turn when it is offered or demanded by the employer, subject of course to collective bargaining provisions. It is obvious that during the period of his removal the doctor lost that right. If he can demonstrate, based on past statistics, that he had actually taken advantage of that right, then in our view there is a sufficient basis to allow the award of overtime pay as part of his "salary or wages" under Section 951(a) of the Act.

---

[4] Section 951(b), which was added by Section 27 of the Act of August 27, 1963, P.L. 1257, pertains to appeals to the Commission alleging discrimination. It reads in pertinent part:

> If [a] final decision [by the Commission] is in favor of the aggrieved person, the commission shall make such order as it deems appropriate to assure the person such rights as are accorded him by this act.

The evidence upon which the amount of overtime is premised appears in the doctor's federal tax forms. For the tax year 1977 the doctor received gross wages of $41,516.94 from the Appointing Authority. Since this was for a full year an average per diem calculation could be made as follows: $41,516.94 divided by 365 equals $113.75 per day. For the tax year 1978 the doctor received $36,087 in gross wages from the Appointing Authority, but this reflects earnings from January 1 through October 3, 1978 only. Reducing this to a per diem figure, as did the estate, it computes as follows: $36,087.00 divided by 276 equals $130.75 per day. For the period subsequent to the doctor's reinstatement in the tax year 1979 he apparently received $6,753.26 from the Appointing Authority although a 1979 W-2 form from the Appointing Authority is not part of the record.[5] The Appointing Authority has maintained that for the time of the doctor's removal he is entitled to his regular salary of $37,098.30 plus leave adjustments. As indicated in footnote 3, we assume that this salary figure is for the total of the 385 days of removal. But, what the record fails to do is give sufficient information from which it can be determined for certain how much of the doctor's gross wages for 1977 and 1978 respectively constituted overtime pay. This determination is important because it is possible that for 1977 and part of 1978 the doctor worked either an inordinate or a minimal amount of overtime. Thus, using the above gross wages as a *per se* basis for establishing overtime for the period

---

[5] We calculate the $6,753.26 by subtracting the doctor's total wages on his 1979 tax return ($18,398.60) from the $11,645.34 that the estate indicates in its affidavit was earned by the doctor prior to his reinstatement. We note that the absence of a 1979 W-2 form from the Appointing Authority might be explained by the litigation in this matter and the fact that backpay was not actually received prior to the end of January, 1980.

in question *where no explanatory evidence has been taken and no facts have been found by the Commission* could result in an unnecessarily speculative award. For this reason, while we are loath to do so for a third time, we must remand the case to the Commission. On remand the Commission is specifically directed to reopen the record and receive additional evidence on the amount of backpay actually reflected in the 1977 and 1978 tax returns and, in addition, make a determination as to whether those amounts are representative of the time period now in question. Other proof the Commission may wish to consider would be statistics indicating the amount of overtime received by other Physician II's at the Polk Center for the time period in question. We suggest the types of evidence not to dictate the type of evidence the Commission is required to receive, but merely to demonstrate that damages in a case such as this can be proven with *reasonable certainty* and the parties should be afforded an opportunity to establish or challenge the figures.[6] Of course, figures can also be stipulated by the parties as reasonably accurate, but either a stipulation or some determination as to the credibility of the evidence is needed.

We now move to consideration of whether the monies the doctor earned during the period of his removal are properly allowed as an offset by the Appointing Authority under the Commission's order allowing a deduc-

---

[6] We add here that the Commission could in its discretion deny overtime pay in the same way that it can order reinstatement and deny all or a portion of back salary where an employee's job related conduct warrants it. *See Elias I.* But where, as here, the *Elias I* criterion is not met, *see Elias II,* and this Court and the Commission have ordered the Appointing Authority to pay *any* loss of wages, the subsequent refusal of the Commission to consider overtime wages as falling within the province of these orders is in error.

tion for "any wages earned." The affidavit submitted by the doctor's personal representative reads as follows:

> The Doctor *took employment* on June 25, 1979 and earned $18,398.60 in the 188 days to the year end or $97.86 per day; and actually earned $11,645.34 in the 119 days between June 25, 1979 and the reinstatement date of October 23, 1979. The Doctor had earned $7,700.00 in private practice in 1978 prior to his termination; that as a result of his unwarranted dismissal, he was required to close his practice and move; that as a result of his loss of private practice he was denied $7,700.00 in private practice income and lost $1,536.79 in closing his practice, or a total of $9,236.79. (Emphasis added.)

From this affidavit two things are evident. First, the doctor actually earned $11,645.34 in outside income during some period of his removal from employment. We note that the estate made this calculation on the same per diem basis as it had used to compute the doctor's rate of pay. Second, the doctor lost $9,236.79 of his private practice income for the period in question. The estate seeks to offset these two figures against each other. The Appointing Authority actually offset the entire $11,645.34 from the salary it calculated that it owed the doctor. We must now decide the propriety of the offsetting each party is seeking to employ, keeping in mind that the Commission's statutory power under Section 951(a) is limited to awarding "salary and wages." *See supra* note 2.

Although these terms are undefined in the Act, the Commission's general powers under Section 203, 71 P.S. §741.203, are limited to enforcing the provisions of the Act. In addition, it is clear from its legislatively designated title in Section 1, 71 P.S. §741.1, and the enunciated purpose in Section 2, 71 P.S. §741.2, that the

Act pertains only to the civil service. Thus, we believe that the salary and wages the Commission can order to be paid must be limited to salary and wages due under the Act with offsets for monies earned by employment *in lieu of the civil service position.* This restrictive interpretation is consistent with *Baker* wherein, as noted previously, we held that the Commission's authority to make an appropriate order under Section 951(b) is limited to assuring that the aggrieved party received the rights given him or her by the statute. With this principle established we now consider the instant case.

The affidavit states that Dr. Elias "took employment" on June 25, 1979 and earned $11,645.34 from that date until his reinstatement. While we are inclined to read "took employment" as a statement that Dr. Elias took another position *in lieu of his civil service position,* such factfinding is within the province of the Commission, not this Court. Because the Commission made no findings on whether the doctor actually took another job in lieu of his civil service position or merely continued in the part-time private practice which he had had during his period of employment with the Appointing Authority, we cannot determine whether the offset for $11,645.34 which the Appointing Authority seeks to make is permissible.

Thus, on remand, the Commission is directed to make findings on whether the doctor took a position *in lieu of his civil service position* or whether he merely continued for a period in his part-time private practice, which apparently he was authorized to do and able to conduct because in both 1978 and in 1979, while employed by the Appointing Authority, Dr. Elias earned additional income from this source. If it finds the former, the offset by the Appointing Authority is proper; if it finds the latter, no offset is allowed. If the Commssion finds that the $11,645.34 represents a combination of

alternate employment and supplemental private practice employment, an offset is to be allowed only to the extent that the figure represents monies earned from employment taken in lieu of the civil service position.

As for the $9,236.79 in losses the doctor incurred via the loss of his "private" practice, we note that this loss would not have been from lost employment taken in lieu of his civil service position. Thus, the private loss here must be distinguished from, and cannot itself be offset against, the offset arising from any possible alternate employment. But even assuming that the cause of the doctor's loss of private practice was his unwarranted removal, we believe that it is beyond the Commission's statutory power to award damages for these consequential damages because we can perceive no way in which this loss of income from a private practice Dr. Elias had *in addition to* his civil service employment constitutes "salary and wages" *under Section 951(a)*.

Finally, we must consider whether the estate is entitled to an award of interest because of what it asserts is undue delay in awarding it backpay. The record discloses that the Commission's order directing the award of backpay was entered on January 13, 1983. The estate submitted its affidavit on January 21, 1983. The record does not reveal on what date the Appointing Authority submitted its figure to the estate, but it must have been prior to April 12, 1983, the date upon which the estate, dissatisfied with the Appointing Authority's figure, sought enforcement of the order. This period of approximately three months does not constitute unreasonable delay. In addition, as both counsel concede in their briefs, there are no cases on point directly interpreting what constitutes salary and wages. Therefore, we cannot say that the Appointing Authority's position in this matter has been unreasonable. Finally, we note that nothing in the Civil Service Act authorizes the Commission

to award interest. Therefore, we specifically decline to authorize the award of interest in this case.

Based upon the foregoing discussion, the order of the Commission is reversed in part and vacated in part and this case is remanded for further proceedings consistent with this opinion.

### ORDER

NOW, June 17, 1986, the determination of the State Civil Service Commission dated June 1, 1983 is reversed insofar as it refused to award overtime pay as a matter of law and the case is remanded for submission of evidence on the amount of overtime pay to which the estate is entitled. It is further ordered that the Commission's allowance of the offset of $11,645.34 by the Appointing Authority is vacated. On remand the Commission is ordered to determine whether Dr. Elias, as of June 25, 1979, took another position in lieu of his civil service position or continued his supplemental part-time practice. After determining these facts the Commission shall issue an appropriate order consistent with this opinion. The estate's request for interest is denied.

Jurisdiction relinquished.

---

CONCURRING AND DISSENTING OPINION BY JUDGE MACPHAIL:

I join the majority opinion on the result reached in the matters of interest and offset.

I respectfully dissent to that part of the majority opinion which would remand to the Board for submission of evidence on the amount of overtime to which the estate of Dr. Elias may be entitled. I am of the opinion that the matter of overtime compensation for a salaried physician is too speculative.

I, accordingly, would affirm the Commission.